## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------- x

In re                                                    :

                                      :    Chapter 11

Rock US Holdings Inc., et al.,[1]                        :

                                        :    Case No. 10-12892 (PJW)

                      Debtors.                     :

                                          :    Jointly Administered

--------------------------------------------------------- x

Rigby 183 LLC,                                           :

                                        :

                    Plaintiff,                  :    Adversary Proceeding No. _____

                                        :

                    v.                          :

                                        :

Bank of Scotland plc; Rock New York (183               :
Madison Avenue) LLC; John Brice Cartwright,            :
in his capacity as administrator of Rock Joint         :
Ventures, Ltd.; Laurie Katherine Manson, in her        :
capacity as administrator of Rock Joint                :
Ventures, Ltd.; Peter Norman Spratt, in his            :
capacity as administrator of Rock Joint                :
Ventures, Ltd.; Emmes Asset Management                 :
Company LLC; Ohio Public Employees                     :
Retirement System; Scott Pudalov and Alan              :
Wildes,                                                :

                                        :

                    Defendants.                 :

--------------------------------------------------------- x

## COMPLAINT

        Plaintiff Rigby 183 LLC ("Rigby"), through its undersigned counsel, brings this

action against defendants Bank of Scotland plc ("Bank of Scotland"); Rock New York (183

Madison Avenue) LLC ("Rock NY"); John Brice Cartwright, in his capacity as administrator of

---

[1]     The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: (i) Rock US Holdings Inc. (4051); (ii) Rock US Investments LLC (5255); (iii) Rock New York (100-104 Fifth Avenue) LLC (9477); and (iv) Rock New York (183 Madison Avenue) LLC (4817). The address for each Debtor is: 183 Madison Avenue, Suite 617, New York NY 10016.

Rock Joint Ventures, Ltd. ("Cartwright"); Laurie Katherine Manson, in her capacity as administrator of Rock Joint Ventures, Ltd. ("Manson"); Peter Norman Spratt, in his capacity as administrator of Rock Joint Ventures, Ltd. ("Spratt"); Emmes Asset Management Company LLC ("Emmes"); Ohio Public Employees Retirement System ("OPERS"); Scott Pudalov ("Pudalov") and Alan Wildes ("Wildes"), and in support thereof, respectfully alleges as follows:

**NATURE OF ACTION**

1.      This is an action for declaratory relief, specific performance and damages relating to Rock NY's breach of an Agreement of Purchase and Sale, dated August 26, 2010, between Rigby and Rock NY (the "APA"), pursuant to which Rock NY agreed to sell, and Rigby agreed to buy, a commercial office building located at 183 Madison Avenue in the City of New York (the "Madison Avenue Property"), and the remaining defendants' tortious interference with that agreement.

2.      Prior to commencing its Chapter 11 case, Rock NY conducted an extensive international marketing campaign for the sale of the Madison Avenue Property.  After a time-consuming and costly bidding process, Rigby submitted the highest and best bid to purchase the Madison Avenue Property, and subsequently entered into the APA with Rock NY.  In order to induce Rigby (and other bidders) to actively participate in the sales process and make its highest and best bid for the property, certain bid incentives were included in the APA, including a non-solicitation provision which prohibits Rock NY from taking "any action, directly or indirectly, to cause, promote, authorize, or result in a Competing Transaction…."[2]

3.      Rigby has now discovered that despite this contractual obligation, Rock NY took actions that directly resulted in a Competing Transaction.  After entering into the APA, Rock NY

---

[2]  *See* Exhibit A, Section 2.4(b) of the Agreement of Sale and Purchase.

2

engaged in discussions with Pudalov and Wildes, in an attempt to settle a lawsuit that was filed by Pudalov and Wildes against certain Debtors, Bank of Scotland's parent company and the Rock Administrators[3] in the Southern District of New York (the "Pudalov Action").  This lawsuit alleged that defendants wrongfully deprived Pudalov and Wildes of purported ownership and profit interests in the Madison Avenue Property and other assets, including a right of first refusal on the sale of the Madison Avenue Property.

4.     Rock NY did not disclose the Pudalov Action to Rigby until well after it had signed the APA, despite the fact that Rock NY and the Rock Administrators apparently deem the Pudalov Action to be material to the sale of the Madison Avenue Property.

5.     As a direct result of Rock NY's and the Rock Administrators discussions with Pudalov and Wildes, Rock NY received a competing offer for the Madison Avenue Property from Emmes, Pudalov, Wildes and OPERS (the "Emmes Purchasers").  As part of this offer, Pudalov and Wildes have agreed to dismiss their lawsuit without receiving any payment from the Bank of Scotland, the Rock Administrators, or the Debtors in return for Rock NY abandoning Rigby and instead selling the Madison Avenue Property to them.

6.     The Bank of Scotland and the Rock Administrators authorized and promoted this Competing Transaction because they wanted the Pudalov Action, in which they (and Bank of Scotland's parent) were named defendants, to be dismissed.

7.     Significantly, Rock NY, the entity that owns the Madison Avenue Property and that entered into the APA with Rigby, is not a party to the Pudalov Action and, thus, would receive no value as a result of its settlement.  Furthermore, as a practical matter, the settlement of

---

[3]   Cartwright, Manson and Spratt (the "Rock Administrators"), control Rock NY (as well as the other Debtors in this proceeding) as insolvency administrators of Rock NY's sole equity holder, Rock Joint Ventures, Ltd.

3

the Pudalov Action would have no value to **any** of the Debtors, since Pudalov and Wildes are unsecured creditors of the Debtors and thus even if they succeeded in obtaining a judgment, they would not be able to recover anything.[4]  By contrast, if the Competing Transaction is allowed to proceed, the Debtors would not receive any more cash from the sale (since Rigby has offered to pay more than the Emmes Purchasers), but Bank of Scotland's parent company and the Rock Administrators would get to walk away from the Pudalov Action with a general release at no cost whatsoever.

8.      Moreover, having induced Rock NY to obtain the Emmes Purchasers' collusive bid, Defendants are now frustrating Rigby's contractual right to match any qualified competing offer.  At the behest of the Bank of Scotland and the Rock Administrators, Rock NY maintains that the settlement with Pudalov and Wildes constitutes valuable consideration for the purchase of the Madison Avenue Property and have demanded that Rigby match that consideration as well as the Emmes Purchasers' proposed purchase price.  Rock NY, however, has refused to quantify the settlement's value, therefore making it impossible for Rigby to include an equivalent value in its offer to match.  In fact, because of Bank of Scotland and the Rock Administrators' self-interested desire to avoid proceeding with the Pudalov Action, Rock NY has suggested that it would be impossible for Rigby to match the Emmes Purchasers' offer.

9.      Defendants' ongoing interference with Rigby's rights under the APA, and Rock NY's persistent breaches of its contractual obligations, are unlawfully depriving Rigby of the right to purchase the Madison Avenue Property—a deprivation that money damages cannot fully remedy.  Nevertheless, Rigby has made every effort to overcome these intentional roadblocks,

---

[4]   Bank of Scotland's senior debt is so under-secured that the proceeds of any sale of the Madison Avenue Property (Rock NY's sole asset) will go only to Bank of Scotland, thus no unsecured judgment creditor will be able to collect from the Debtors.

PAC 989383v.1

including offering to increase its purchase price above that of the Emmes Purchasers.  Having no

other recourse, Rigby now seeks relief from this Court.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 and Federal Rule of

Bankruptcy Procedure 7001 because this is a civil proceeding arising in or related to the Debtors'

case under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

11.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1334.

12.     Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C.

§§ 1408 and 1409 because this action arises under and is related to the underlying bankruptcy

proceeding.

13.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

## THE PARTIES

14.     Plaintiff Rigby 183 LLC is a limited liability company organized under the laws

of the State of New York with its principal place of business located at 589 Fifth Avenue, Suite

600, New York, NY 10017.

15.     Upon information and belief, Defendant Bank of Scotland is a public limited

company organized under the laws of the United Kingdom.

16.     Upon information and belief, Defendant Rock NY is a limited liability company

organized under the laws of the State of Delaware.

17.     Upon information and belief, Defendant Cartwright is a natural person who

resides in the United Kingdom.  Cartwright is a partner in PricewaterhouseCoopers LLP and acts

as an administrator of Rock Joint Ventures, Ltd.

5

18.     Upon information and belief, Defendant Manson is a natural person who resides in the United Kingdom.  Manson is a director of PricewaterhouseCoopers LLP and acts as an administrator of Rock Joint Ventures, Ltd.

19.     Upon information and belief, Defendant Spratt is a natural person who resides in the United Kingdom.   Spratt is a partner in PricewaterhouseCoopers LLP and acts as an administrator of Rock Joint Ventures, Ltd.

20.     Upon information and belief, Defendant Emmes is a limited liability company organized under the laws of the State of Delaware.

21.     Upon information and belief, Defendant OPERS is a state pension fund organized under the laws of the State of Ohio with its principal place of business located in Columbus, Ohio.

22.     Upon information and belief, Defendant Pudalov is a natural person who resides in the State of New York, County of New York.

23.     Upon information and belief, Defendant Wildes is a natural person who resides in the State of New York, County of Westchester.

## FACTUAL BACKGROUND

### A.     THE MADISON AVENUE PROPERTY

24.     On September 15, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code.

25.     Rock NY, one of the Debtors, owns and operates a pre-war commercial office building located at 183 Madison Avenue on the corner of Madison Avenue and 34th Street in the Borough of Manhattan, New York (the "Madison Avenue Property").

26.     Upon information and belief, sometime in or around 2007, Debtors hired Pudalov and Wildes as directors to help manage the Madison Avenue Property.

6

27.    On May 28, 2009, Cartwright, Manson, and Spratt (collectively the "Rock Administrators") were appointed as joint insolvency administrators of Rock Joint Ventures Ltd. ("RJV"), an English registered company which is in administration proceedings in the United Kingdom.  RJV is the ultimate sole equity holder of the Debtors.  Upon their appointment, the Rock Administrators assumed control of RJV's subsidiaries, including Rock NY.

28.    Upon information and belief, after being appointed the administrators of RJV, the Rock Administrators conducted an investigation of the status and condition of the Madison Avenue Property and the management of Pudalov and Wildes.  As a result, Pudalov and Wildes, who were managers of the Madison Avenue Property, were terminated for cause.

29.    Upon information and belief, Pudalov was terminated, in part, because the investigation conducted by the Rock Administrators produced information indicating that, throughout the period of Pudalov's management of the Madison Avenue Property, millions of dollars of the Bank of Scotland's loan proceeds were filtered to a general contractor for building improvements, who had a secret side-deal to funnel a portion of that money – at least $1 million – to Pudalov.  Further, over a hundred thousand dollars were spent by the Debtors on travel and entertainment for Pudalov and Wildes, and it is not clear that these expenses were wholly or appropriately incurred on behalf of Debtors.

30.    The Rock Administrators decided to replace the prior management of the Madison Avenue Property with Sharon Manewitz and Michael Brody, who serve as directors and/or officers of each of the Debtors (the "Directors").

31.    Prior to the Petition Date, the Rock Administrators, the Directors, and the Bank of Scotland determined that a prompt sale of the Madison Avenue Property would maximize the value of the property and was, therefore, in the best interests of the Debtors.

7

B.    NEGOTIATIONS LEADING UP TO THE APA

32.    On June 2, 2010, prior to commencing their Chapter 11 cases, the Debtors, engaged Studley, Inc. ("Studley"), to act as their broker to market the Madison Avenue Property for sale.  Studley conducted an international marketing campaign for the sale of the property. The sales marketing campaign spanned several months and ultimately resulted in multiple bidders expressing interest.

33.    As part of the sales marketing campaign, the Debtors, through Studley, conducted several rounds of bidding for the Madison Avenue Property.

34.    Upon information and belief, Pudalov knew of and had an opportunity to participate in the bidding process, but elected not to conduct due diligence or to submit a bid for the Madison Avenue Property in accordance with the other bidders.

35.    Upon information and belief, Emmes knew of and had an opportunity to participate in the bidding process.  Emmes entered into a confidentiality agreement with respect to the Madison Avenue Property, but did not tender a bid on the property in accordance with the process then in place.

36.    On June 16, 2010, Rigby signed a confidentiality agreement with respect to the purchase of the Madison Avenue Property.

37.    The deadline for the first round of bids for the Madison Avenue Property was July 22, 2010, approximately five weeks after potential bidders were first contacted (the "First Bid Deadline").  On July 22, 2010, Rigby made a first bid offer for the Madison Avenue Property.

38.    Upon information and belief, following the First Bid Deadline, Studley, in consultation with the Debtors, the Rock Administrators and the Bank of Scotland, selected five of the leading bidders for the Properties.  Thereafter, the leading bidders were each provided

8

with a form of an Agreement of Sale and Purchase and were invited to participate in a second, and anticipated final, round of bidding. The deadline for the second round bids was set for August 19, 2010 (the "Second Bid Deadline").

39.    As part of the second round of bidding, bidders were expected to submit a mark-up of the form Agreement of Sale and Purchase that had been provided by the Debtors, complete all due diligence, and submit final, binding bids not contingent on financing.

40.    On August 5, 2010, Rigby received the Debtors' form Agreement of Sale and Purchase.

41.    In connection with the due diligence process, Rigby learned that, sometime subsequent to Pudalov's termination, Pudalov produced a purported letter agreement, dated October 16, 2008 (the "ROFR Contract"), which purports to grant Pudalov a right of first refusal to purchase the Madison Avenue Property.

42.    In connection with the due diligence process, Debtors, through Studley, advised Rigby that they intended to reject the ROFR Contract under section 365(a) of the Bankruptcy Code and sell the Madison Avenue Property "free and clear" of that alleged right.

43.    Although Debtors disclosed to Rigby the alleged rights under the ROFR Contract, Debtors did not disclose to Rigby any litigation with Pudalov that they, or any parties affiliated with Debtors, were involved in.

44.    On August 9, 2010, Rigby sent Debtors a marked-up form Agreement of Sale and Purchase. Among other things, Rigby requested that one of the conditions to the closing of the agreement be that this Court enter an order confirming the Plan which, among other things, rejects the ROFR Contract for the Madison Avenue Property.

PAC 989383v.1

45.     As the negotiation and due diligence process continued, Rigby was assured by Rock NY that all suits and proceedings, including any related to the ROFR Contract, would be discharged in bankruptcy upon confirmation of the Plan.  At no time was Rigby advised that there was any other litigation against Rock NY or any of its affiliates that in any way related to the Madison Avenue Property.

46.     On August 16, 2010, Rigby received a revised Agreement of Sale and Purchase from Debtors.  No litigation or other proceedings with Pudalov or Wildes was disclosed in the body of this draft agreement or in any of the schedules attached thereto.

47.     Rigby expended considerable time, effort and resources with respect to the auction, bidding and due diligence process for the Madison Avenue Property.  On August 19, 2010, Rigby submitted a final offer for the purchase of the Madison Avenue Property.

48.     At the conclusion of the final bidding rounds, the Debtors, in consultation with the Rock Administrators and Bank of Scotland, selected Rigby as the highest and best bidder for the Madison Avenue Property.

49.     On August 24, 2010, Debtors requested that Rigby increase its bid by $250,000.  Rigby agreed to increase its bid by such amount.

50.     On August 25, 2010, Rigby received a revised Agreement of Sale and Purchase for execution.  In addition, Rigby received confirmation from Rock NY that there were no claims outstanding related to the Madison Avenue Property (other than the purported rights asserted under the ROFR Contract).

51.     On August 26, 2010, Rock New York entered into an Agreement of Sale and Purchase with Rigby for the sale of the Madison Avenue Property for a purchase price of

$75,244,114.00 plus the assumption of the Assumed Liabilities.  A copy of the APA is attached hereto as Exhibit A.

52.    The Bank of Scotland, which holds mortgages, liens and security interests securing indebtedness of the Debtors in the aggregate amount of not less than $303,000,000.00, and whose claims are significantly under-secured, has accepted the Plan and consented to the sale of the Madison Avenue Property to Rigby.

C.    **THE TERMS OF THE APA**

53.    Section 2.4(b) of the APA precludes Rock NY from soliciting or otherwise inducing any third party to make a competing bid for the Madison Avenue Property.  It states:

> Unless and until this Agreement is terminated in accordance with Article XIII, except as Seller may reasonably determine in good faith to be otherwise required in connection with applicable fiduciary duties after consultation with counsel, Seller shall not, except as otherwise required by the Bankruptcy Court, knowingly take any action, directly or indirectly, to cause, promote, authorize, or result in a Competing Transaction, including, without limitation, granting access to any third parties to Seller's assets, business records, officers, directors, or employees, which access, to Seller's knowledge, relates to, or is reasonably expect to lead to, a Competing Transaction or a potential Competing Transaction.

54.    Section 2.4(c) of the APA provides restrictions on Rock NY's ability to accept an unsolicited competing offer, including an overbid requirement of $1 million, for the Madison Avenue Property.  Specifically, Section 2.4(c) provides:

> Unless and until this Agreement is terminated in accordance with Article XIII, if any person or entity offers to enter into a Competing Transaction with Seller, except as Seller may reasonably determine in good faith to be otherwise required in connection with its applicable fiduciary duties (after consultation with counsel) or as otherwise required by the Bankruptcy Court, Seller shall not (i) enter into any agreement relating to such Competing Transaction, or (ii) file any plan of reorganization proposed or supported by Seller that seeks approval of such Competing Transaction, unless (x) the consideration to be paid by such person or entity in connection with the Competing

11

Transaction (and, for purposes of the foregoing and Section 2.4(d) below, consideration paid by such person or entity shall include any Liabilities assumed and/or payments made to creditors by such person or entity in connection with such Competing Transaction) is at least $1,000,000 greater than the Purchase Price or the amount of any prior improvement thereto in accordance with the provisions of this Section 2.4(c), and (y) the offer is in writing, binding on the offeror, and, in Seller's reasonable judgment, contains closing contingencies not materially different than those contained in this Agreement (a "**Qualified Competing Transaction Proposal**").

55.     Section 2.4(d) of the APA provides that, if Rock NY accepts an unsolicited competing offer for the Madison Avenue Property pursuant to section 2.4(c) of the APA, Rock NY will provide notice to Rigby of the offer and Rigby will have an opportunity to match the offer within five days.

56.     Pursuant to Section 20.8, the APA is governed by New York law.

**D.     THE PUDALOV AND WILDES LAWSUIT**

57.     Upon information and belief, following their termination for cause, Pudalov and Wildes threatened the Debtors with a lawsuit, and the Rock Administrators spent some time and effort endeavoring unsuccessfully to negotiate a resolution of the dispute with them.  During the course of those negotiations, Pudalov, through his counsel, produced for the first time the ROFR Contract.

58.     Upon information and belief, the ROFR Contract purportedly granted Pudalov a right of first refusal to purchase the Madison Avenue Property.  In their review of the books and records of RJV and Rock NY, both the Rock Administrators and the Directors have never located a copy of the ROFR Contract, nor have they located any reference to it in the corporate minutes, nor are they aware of any consideration that might have been given by Pudalov for the purported right of first refusal granted by the ROFR Contract beyond the normal services he was already obligated to perform and for which he was already more than well compensated.

12

59.     Upon information and belief, in several meetings between the Rock Administrators and Pudalov, Pudalov never mentioned or produced the ROFR Contract – it only appeared after his dismissal for cause and in the negotiations over his threatened litigation.

60.     Upon information and belief, upon commencement of the marketing process for the Madison Avenue Property, the Debtors notified Pudalov through his counsel of the pending process, and invited him to access the confidential data room set up for the benefit of potential buyers.  Pudalov refused to participate in that process.

61.     Instead, on June 29, 2010—the same month that Rock NY began the bidding process for the Madison Avenue Property—Pudalov and Wildes filed a lawsuit in the Supreme Court of the State of New York, County of New York against HBOS Plc (Bank of Scotland's parent entity), the Rock Administrators, Rock US Property Management LLC, Birchridge NY LLC, Rock US Investments LLC and Rock US Holdings Inc.  Pudalov and Wildes did not assert claims against Rock NY.

62.     On or about July 23, 2010, this action was removed to the United States District Court for the Southern District of New York, Index No. 1:10 Civ. 5633 PAC (GWG) (the "Pudalov Action").  In the complaint, Pudalov and Wildes alleged that the defendants conspired to deprive them of their alleged profit interests in the Madison Avenue Property and another office building on Fifth Avenue in New York, New York (also ultimately owned by RJV) and their alleged equity interests in "Birchridge NY LLC," and that the Rock Administrators wrongfully asserted control and dominion over Rock US Property Management LLC's electronic files.  The Pudalov Action sought damages and a permanent injunction of any sale of the Madison Avenue Property or the Fifth Avenue property.

PAC 989383v.1

E.     PARTIAL PERFORMANCE OF THE APA

63.     On the Petition Date, Debtors filed a joint, "pre-packaged" chapter 11 plan (the "Plan") pursuant to which they seek, among other things, to sell the Madison Avenue Property.

64.     The Debtors determined that the existence of the ROFR Contract would impede Debtors' ability to maximize the value of the Madison Avenue Property.  Therefore, on the Petition Date, the Debtors filed a motion for an order seeking to reject the ROFR Contract.

65.     In addition, on the Petition Date, the Debtors made a motion before this Court to approve the bid incentives included in the APA, and informed the Court that the Debtor's intended to sell the Madison Avenue Property to Rigby (the "Bid Incentives Motion").

66.     On October 5, 2010, Pudalov and Wildes filed a motion asking this Court to deny or adjourn the Bid Incentives Motion as to the Madison Avenue Property on the basis that it was premature since Pudalov and Wildes were pursuing their rights under the ROFR Contract.

67.     Rock NY assured Rigby that there would be no delay in the confirmation hearing, despite Pudalov and Wildes' motion, and that Debtors would make every effort to limit Pudalov and Wildes' discovery requests.  Further, on or about October 6, 2010, Rock NY told Rigby that Pudalov might submit an offer, but assured Rigby that it was "not being used as a stalking horse" and that the "match right is proper under the law and appropriate in this instance."  Rigby relied upon the representations and assurances of Rock NY regarding its intent to pursue the sale with Rigby in accordance with the APA.  Rigby expended substantial amounts of time, effort and expense in connection with formulating and refining its bid, and negotiating and preparing the APA.

68.     Yet, a stalking horse is precisely what Rigby became.  Upon information and belief, the Emmes Purchasers used the Pudalov Action as a bargaining chip with Bank of Scotland and the Rock Administrators.

69.     Upon information and belief, HBOS was concerned about its potential liability in the Pudalov Action and knew that the Emmes Purchasers wanted to purchase the Madison Avenue Property.  HBOS therefore caused Bank of Scotland to exert improper pressure on the Rock Administrators to cause Rock NY to sell the Madison Avenue Property to the Emmes Purchasers.

70.     Upon information and belief, the Rock Administrators, faced with their own personal liability in the Pudalov Action, directed Rock NY to cause the Emmes Purchasers to bid on the Madison Avenue Property.  In return for favoring that bid, Pudalov and Wildes would settle the Pudalov Action and provide HBOS, the Rock Administrators, and the Rock-entity defendants with a general release of all claims.

F.     THE EMMES, PUDALOV, WILDES OFFER

71.     Upon information and belief, on October 13, 2010, Rock NY received a letter sent on behalf of Emmes, Pudalov and Wildes offering to purchase the Madison Avenue Property for $76,200,000.00.  This proposed purchase price did not exceed Rigby's Purchase Price by $1 million and for this reason, among others, was not a Qualified Competing Transaction Proposal under Section 2.4(c) of the APA.

72.     Nevertheless, on October 15, 2010, Rock NY informed Rigby that it had decided to grant the Emmes Purchasers access to the due diligence materials for the Madison Avenue Property.  However, Rock NY assured Rigby that it did not consider this to be a serious offer.  In

reality, and based upon subsequent statements to Rigby, Rock NY considered a settlement of the Pudalov Action to be a material issue relating to the sale of the Madison Avenue Property.

73.     Upon information and belief, on October 29, 2010, Rock NY received a letter outlining a proposal for the purchase of the Madison Avenue Property from the Emmes Purchasers.  The proposal letter submitted by the Emmes Purchasers was accompanied by (i) a mark-up of the APA executed by Rigby; (ii) a letter from OPERS supporting the bid and the funding of the down-payment and purchase price; and (iii) a letter outlining the proposed settlement of the Pudalov Action.

74.     Upon information and belief, since October 29, 2010, Rock NY further received (i) a settlement agreement executed by Pudalov and Wildes; (ii) a mutual general release executed by Pudalov and Wildes; (iii) a Stipulation of Dismissal with Prejudice executed by Pudalov and Wildes in connection with the dismissal of the Pudalov Action.

75.     The terms of the Pudalov Action settlement do not require any monetary payment to Pudalov and Wildes by HBOS, the Rock Administrators, or the Rock entity defendants.  This walk away agreement provides substantial value to HBOS and the Rock Administrators.  But the settlement provides no benefit to the Debtors, and in particular provides no benefit to Rock NY.

76.     Not only was Rock NY not a party to the Pudalov Action, but, even if the plaintiffs in the Pudalov Action were to win an award of judgment, they would simply become unsecured judgment creditors.  As the Debtors have represented in this proceeding, Bank of Scotland is severely under-secured.  As a result, it is the only entity that will receive a distribution of the sale proceeds for the Madison Avenue Property.  Unsecured creditors will not be able to recover.  Accordingly, setting aside that Rock NY itself had no liability in the Pudalov Action as a non-party, neither it nor the other Debtors would obtain any value from a settlement

16

since they had no assets with which to pay any potential judgment. The same could not be said of Bank of Scotland or the Rock Administrators, and it was only for their benefit and at their direction that Rock NY reneged on its obligations to Rigby.

77.     After the APA was executed and Rock NY eventually disclosed limited information concerning negotiations with Pudalov and Wildes, Rock NY consistently assured Rigby that the confirmation of the Plan would eliminate and discharge all litigation relevant to the bankruptcy case and specifically would eliminate the ROFR Contract claims, which are a subject and basis of the Pudalov Action.

### G.     RIGBY'S EXERCISE OF ITS MATCHING RIGHT

78.     On November 4, 2010, Rigby received a letter from Rock NY, which claimed that the offer from the Emmes Purchasers was a Qualified Competing Transaction Proposal (the "Notice"), and further claimed that such proposal was more beneficial to Rock NY than the transactions contemplated by the APA.

79.     Pursuant to the Notice, Rock NY informed Rigby that the Emmes Purchasers (a) offered a purchase price of Seventy-Six Million Two Hundred Fifty Thousand Dollars ($76,250,000.00) for the Purchased Assets, (b) slightly modified closing contingencies from those set forth in the Rigby Purchase Agreement and (c) agreed to dismiss the Pudalov Action. The purchase price was $1.06 million higher than the Purchase Price in the APA, though if Rock NY closed with the Emmes Purchasers, it would have to pay Rigby a break-up fee of 1% of the purchase price—thus substantially diminishing the actual added value of the Emmes Purchasers' offer.

80.     Although Rock NY is not a party to the Pudalov Action, in its Notice, it indicated that the dismissal of the Pudalov Action would provide some unspecified value to it in connection with the Emmes Purchasers' purchase of the Madison Avenue Property.

17

81.    Rigby has repeatedly attempted to ascertain from Rock NY some type of quantification for the settlement of the Pudalov Action.  To date, and despite Rigby's repeated requests, Rock NY has refused to provide such quantification, claiming that it is only acting at the behest of Bank of Scotland.  Accordingly, under the terms of the APA, Rigby is not required to provide any type of "match" related to the settlement of the Pudalov Action.

82.    Incredibly, Rock NY has further made clear that it will not accept **any** increase in Rigby's purchase price as matching the purported value of the Pudalov Action settlement.

83.    By agreement, dated November 8, 2010, Rock NY and Rigby agreed that, notwithstanding the terms and provisions of Section 2.4(d) of the APA and the Notice, the period in which Rigby was entitled to submit a matching proposal to the Qualifying Competing Transaction Proposal was extended up to and including November 11, 2010, at 12:00 noon (EST).

84.    On November 11, 2010, in accordance with Section 2.4(d) of the APA, Rigby modified the APA to increase the Purchase Price to Seventy-Six Million Five Hundred Thousand Dollars ($76,500,000)—not only matching the Emmes Purchasers' offer, but topping it.

85.    The right to match a competing offer was intended to address third party offers for the Madison Avenue Property and was intended to provide Rigby with the opportunity to match the consideration.  Rigby has properly exercised that right and, thus, seeks specific performance of the APA.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment against Rock NY)

86.    Rigby repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-85.

87.    As a result of the foregoing, an actual justiciable controversy ripe for judicial determination has arisen and now exists between Rigby and Rock NY regarding the parties' respective rights and obligations under APA and, in particular, whether Rigby's November 11 matching offer constitutes a valid and enforceable exercise of Rigby's rights pursuant to Section 2.4(d).

88.    This controversy is real and adverse.  Rigby and Rock NY entered into the APA, which gave Rigby the right to match any Qualified Competing Transaction Proposal.  The match right induced Rigby to enter into the APA.  Even assuming that Rock NY properly considered the Emmes Purchasers' October 29 offer to be a Qualified Competing Transaction Proposal, Rigby's November 11 matching offer constitutes a valid exercise of the match right in Section 2.4(d) of the APA.  Nevertheless, Rock NY has indicated that it does not and will not accept Rigby's matching offer because it purportedly does not provide any matching consideration for the settlement of the Pudalov Action.  As explained above, Rock NY has refused to indicate how it quantifies the settlement and, in fact, perhaps explaining such refusal, the settlement provides no benefit or value to Rock NY or any of the Debtors at all.

89.    Pursuant to the provisions of 28 U.S.C. § 2201, Rigby is entitled to a declaration by the Court of its rights under the APA, and a declaration that its November 11 matching offer constitutes a valid and enforceable exercise of Rigby's match right under Section 2.4(d) of the APA.  A judicial declaration is necessary to affirm and enforce the rights and obligations of the parties.

90.    Rigby seeks a determination that its exercise of its rights pursuant to Section 2.4(d) of the APA, as reflected in the November 11 matching offer, is valid and enforceable, and

that Rock NY must therefore proceed with the sale of the Madison Avenue Property to Rigby under the terms of the APA.

91.     Rigby lacks an adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract against Rock NY)

92.     Rigby repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-91.

93.     The APA is a valid and binding contract.

94.     Section 2.4(b) precludes Rock New York from "knowingly tak[ing] any action, directly or indirectly, to cause, promote, authorize, or result in a Competing Transaction."

95.     By entering into negotiations with the Pudalov and Wildes to settle the Pudalov Action, Rock NY took action, directly or indirectly, that it knew would lead to and/or result in a Competing Transaction in violation of Section 2.4(b).

96.     As a direct and proximate result of Rock NY's breach, Rigby is being deprived of its right to purchase unique real property, for which money damages are inadequate.  Rigby requests that the Court order Rock NY to specifically perform the APA, as modified by Rigby's November 11 match letter.

97.     In the alternative, Rigby has been damaged in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing against Rock NY)

98.     Rigby repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-97.

99.     Through its bad faith conduct, and acts and omissions described above, Rock NY has breached the covenant of good faith and fair dealing.  The APA reflects Rigby's substantial

20

and good faith efforts to purchase the Madison Avenue Property—efforts that culminated in what Rock NY conceded was the highest and best bid.  Among the rights Rigby sought in the APA was the right, contained in Section 2.4, to match any unsolicited Qualified Competing Transaction Proposal in the event a new bidder unexpectedly emerged after the APA was executed.

100.    If Rigby matches any such offer, Section 2.4(d) requires Rock NY to exercise reasonable judgment to assess whether Rigby's modified terms "match the terms offered in the Qualified Competing Transaction Proposal, including, without limitation, matching the consideration offered to be paid by the person or entity submitting the Qualified Competing Transaction Proposal."

101.    Rock NY has an implied obligation to quantify any non-monetary consideration in a competing offer so that Rigby may exercise its match right.  In breach of this obligation, Rock NY has repeatedly refused to quantify the value of the Pudalov Action settlement agreement and instead claims that Rigby can offer no modified terms that would match the value of the Pudalov Action settlement.

102.    Moreover, the APA explicitly contemplated, and Rock NY repeatedly represented, that Rock NY would act to ensure that all claims based on Pudalov's purported ROFR Contract would be discharged in connection with this Court's approval of the Plan.  Rock NY is now refusing to comply with those terms of the APA, and is wrongfully using the settlement of the Pudalov Action as justification for its refusal to not sell the Madison Avenue Property to Rigby.

103.    Rock NY's actions constitute bad faith and a breach of the APA.  The Pudalov Action settlement provides absolutely no value to the Debtors.  Any judgment against Rock NY

21

in the Pudalov Action would constitute an unsecured claim that would be trumped by Bank of Scotland's rights as a secured creditor. Because Bank of Scotland's loans are severely under-secured, the overwhelming majority of the proceeds of any sale of the Madison Avenue Property will benefit Bank of Scotland as secured creditor, and provide no compensation to Rock NY's unsecured creditors. Pursuant to Section 3.02 of the Plan, no distributions will be made to unsecured creditors. Accordingly, the settlement provides no additional consideration to the Debtors' estates. The only parties that would benefit from the Pudalov Action settlement are Bank of Scotland's parent company, HBOS, and the Rock Administrators.

104.    Rather than act in good faith, and pursuant to the implied and express terms of the APA, Rock NY has acted to benefit the Rock Administrators and Bank of Scotland's parent company by conspiring to characterize the Pudalov Action settlement as consideration to Rock NY and refusing to quantify that purported consideration for Rigby or accept Rigby's superior modified bid pursuant to Section 2.4(d). As a result, the Rock Administrators and HBOS obtained a general release from Pudalov and Wildes at no cost to themselves, but to the material detriment of Rigby.

105.    As a direct and proximate result of Rock NY's bad faith conduct, Rigby is being deprived of its right to purchase unique real property, for which money damages are inadequate. Rigby requests that the Court order Rock NY to specifically perform the APA, as modified by Rigby's November 11 match letter.

106.    In the alternative, Rigby has been damaged in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### (Tortious Interference with Contract against Bank of Scotland)

107.    Rigby repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-106.

22

108.    The APA is a valid and binding contract between Rigby and Rock NY.

109.    Bank of Scotland knew of the existence of the APA.

110.    Bank of Scotland used wrongful means to intentionally induce Rock NY to breach the APA, as alleged above.  Without limitation, Bank of Scotland wrongfully exerted pressure as a significant secured creditor of Rock NY (and RJV generally) to induce Rock NY to obtain a competing offer from the Emmes Purchasers.  Bank of Scotland did so in order to benefit its parent company HBOS, knowing that Pudalov and Wildes would abandon the Pudalov Action in return for the Madison Avenue Property.  Having obtained precisely that result, Bank of Scotland induced Rock NY to use the Pudalov Action settlement as a façade to improperly frustrate and ultimately reject any attempt by Rigby to match the Emmes Purchasers' purported Qualified Competing Transaction Proposal.

111.    As a direct and proximate result of Bank of Scotland's wrongful conduct, Rigby has been damaged in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### (Tortious Interference with Contract against the Rock Administrators)

112.    Rigby repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-111.

113.    The APA is a valid and binding contract between Rigby and Rock NY.

114.    The Rock Administrators knew of the existence of the APA.

115.    The Rock Administrators used wrongful means to intentionally induce Rock NY to breach the APA.  Without limitation, the Rock Administrators directed Rock NY to take actions that induced and resulted in the Emmes Purchasers' Competing Transaction.  The Rock Administrators did so in order to obtain for themselves and HBOS a no-payment dismissal of the Pudalov Action despite the clear terms of Section 2.4 of the APA, and despite the absence of any

23

benefit to Rock NY from the settlement of the Pudalov Action. They then directed Rock NY to refuse to value the Pudalov Action settlement and thereby frustrate any attempt by Rigby to exercise its match rights under the APA.

116.    As a result of the Rock Administrators' wrongful conduct, Rigby has been damaged in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**

**(Tortious Interference with Contract against the Emmes Purchasers)**

117.    Rigby repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-116.

118.    The APA is a valid and binding contract between Rigby and Rock NY.

119.    The Emmes Purchasers knew of the existence of the APA.

120.    The Emmes Purchasers used wrongful means to intentionally induce Rock NY to breach the APA. Without limitation, Pudalov and Wildes filed the Pudalov Action in the midst of the bidding process for the Madison Avenue Property to intimidate Bank of Scotland, the Rock Administrators, and the Rock entities into causing Rock NY to sell the Madison Avenue Property to the Emmes Purchasers. After Rigby became the winning bidder and entered into the APA with Rock NY, the Emmes Purchasers used the Pudalov Action to induce Rock NY (through Bank of Scotland and the Rock Administrators) to enter into negotiations to sell the Madison Avenue Property to them rather than Rigby, in violation of the APA.

121.    As a result of the Emmes Purchasers' wrongful conduct, Rigby has been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor:

A.      Awarding declaratory relief;

B.      Directing specific performance of the APA;

C.      Awarding damages in an amount to be proven at trial;

D.      Awarding Plaintiff's costs of suit herein; and

E.      Granting Plaintiff such other legal or equitable relief as is just and appropriate.


Dated:  Wilmington, Delaware
        November 11, 2010                     **POTTER ANDERSON & CORROON LLP**


                                             _/s/ Jeremy W. Ryan_____
                                             Jeremy W. Ryan (DE Bar No. 4057)
                                             1313 North Market Street, 6th Floor
                                             Wilmington, Delaware 19801
                                             Telephone:  (302) 984-6000
**OF COUNSEL:**                              Facsimile:  (302) 658-1192

**QUINN EMANUEL URQUHART**                   *Counsel For Plaintiff Rigby 183 LLC*
  **& SULLIVAN, LLP**
Michael B. Carlinsky
Deborah K. Brown
Robert W. Scheef
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile: (212) 849-7100